CUAUHTÉMOC ORTEGA (Bar No. 257443)
Federal Public Defender
WASEEM SALAHI (Bar No. 325362)
DAVID MENNINGER (Bar No. 281460)
Deputy Federal Public Defenders
321 East Second Street,
Los Angeles, California 90012-4202
    cuauhtemoc_ortega@fd.org
    waseem_salahi@fd.org
    david_menninger@fd.org
    (213) 894-2854
    (213) 894-0081 FAX

Attorneys for Defendant
LUIS ALFREDO DE LA ROSA RIOS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES,<br><br>           Plaintiff,<br><br>      v.<br><br>LUIS ALFREDO DE LA ROSA RIOS, ET AL.,<br><br>           Defendant. | No. 2:22-CR-00020-PA-1<br><br>**DEFENDANT LUIS ALFREDO DE LA ROSA RIOS'S SENTENCING MEMORANDUM**<br><br>Date:      Dec. 18, 2023<br>Time:     8:30 a.m. |

Defendant Luis Alfredo De La Rosa Rios, through counsel, files this sentencing memorandum. Mr. Rios seeks a 35-year sentence. His position is based on the attached memorandum of points and authorities and exhibits, which include a sentencing video, lodged separately.

Respectfully submitted,

CUAUHTÉMOC ORTEGA
Federal Public Defender

DATED: December 4, 2023          By /s/ *Waseem Salahi*
                                WASEEM SALAHI
                                DAVID MENNINGER
                                Deputy Federal Public Defenders

1

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT .................................................................................................. 3

    A.    The Advisory Guidelines ........................................................... 3

    B.    Mr. Rios's History and Characteristics ........................................ 5

        1.    Minimal Parental Guidance, Poor Education, Substance Abuse, Exposure to Violence, and Three Suicide Attempts ......................... 5

        2.    Joining F13 ............................................................................... 8

        3.    Efforts to Leave F13: Relocation, Employment, Substance Abuse ...................................................................................... 12

        4.    Post-Arrest Psychological Evaluation ................................. 14

    C.    The Nature and Circumstances of the Offense ......................... 15

    D.    The Need to Avoid Unwarranted Sentencing Disparities ........... 17

        1.    National Sentencing Data ..................................................... 18

        2.    Specific Sentences for Murder in the Racketeering Context ........... 21

    E.    Just Punishment, Deterrence, Public Safety, and Respect for the Law ..... 25

III.  CONCLUSION ............................................................................................. 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States v. Agosto, et al.*
   1:17-cr-00390-RJD-3, 6, & 13 (E.D.N.Y 2017) ........................................ 22

*United States v. Booker*,
   543 U.S. 220 (2005).................................................................................... 3

*United States v. Boscarino*,
   437 F.3d 634 (7th Cir. 2006) ................................................................... 17

*United States v. Bryant*,
   2:18-cr-00204-MHW-2, 19 (S.D. Ohio 2018)........................................... 22

*United States v. Carty*,
   520 F.3d 984, 992–93) (9th Cir. 2008) ................................................... 18

*United States v. Dashawn Romeer Anthony*,
   No. 4:18-cr-00012-MFU (W.D. Va. Jan. 30, 2020) ............................... 24

*United States v. Delgado*,
   15-cr-688-DSF-11 (C.D. Cal. Jul. 21, 2022) .......................................... 21

*United States v. Denzel Lamont Spikes*,
   3:17-cr-00134-FDW-DSC (W.D.N.C. Feb. 1, 2019).............................. 24

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) ................................................................. 26

*United States v. Etienne*,
   3:17-cr-00093-WHA (N.D. Cal. 2017) ..................................................... 21

*United States v. Flores-Ventura*,
   No. 8:18-cr-00070-JKB-1, 2, 3 (D. Md. 2019) ....................................... 23

*Gall v. United States*,
   552 U.S. 38, 50 n.6 (2007) ......................................................................... 3

*United States v. Kasey*,
   No. 7:18-cr-00048-EKD (W.D. Va. 2018)............................................... 24

*Kimbrough v. United States*,
  552 U.S. 85 (2007)................................................................................................. 3

*United States v. Kwon Woo Sung*,
  740 Fed. App'x 878 (9th. Cir. 2018) .................................................................. 17

*United States v. Lopez*,
  No. 4:15-CR-00564-2, 7, 26, 28, 31 (S.D. Tex. 2015)...................................... 23

*United States v. Luis Alfredo Villegas-Rosa*,
  No. 4:17-cr-00016 (W.D. Mo. Sept. 26, 2019) ................................................. 24

*United States v. Murray*,
  897 F.3d 298 (D.C. Cir. 2018).............................................................................. 4

*United States v. Perez-Rodriguez*,
  960 F.3d 748 (6th Cir. 2020) ........................................................................ 4, 18

*United States v. Peter Ojeda*,
  8:11-cr-00148-JVS (C.D. Cal.)........................................................................... 21

*United States v. Ralph Mendez*,
  No. 2:17-cr-00138-PPS-JEM (N.D. Ind. 2017).................................................. 24

*United States v. Roberto Cervantes Serrano*,
  5:16-CR-00482-BLF (N.D. Ca. 2016) ............................................................... 21

*United States v. Rodriguez-Flores*,
  8:20-cr-00229-PX-1 (D. Md. 2020) ................................................................... 23

*United States v. Saeteurn*,
  504 F.3d 1175 (9th Cir. 2007) ........................................................................... 17

*United States v. William Hayslette*,
  1:16-cr-00463 (N.D. Ill. Aug. 9, 2021) ............................................................. 24

**Statutes and Guidelines**

18 U.S.C. § 3553............................................................................................... 2, 3, 26

U.S.S.G. § 2A1.1 ................................................................................................. 4, 25

U.S.S.G. § 4B1.1(a) ................................................................................................. 20

Cal. Penal Code § 189(a) ........................................................................................... 4

## Points & Authorities

### I.    Introduction

Luis Alfredo De La Rosa Rios recognizes and deeply regrets that his actions caused the death of a young man his own age.  Though this case was heavily litigated in its final pretrial phase, Mr. Rios was never interested in going to trial.  Consistently from the outset, he was eager to take responsibility because he knew that he committed a serious crime, that he deserved punishment, and that the victims' families should have closure.  On July 13, 2023, he stood before this Court, confessing to the robbery and killing of F.A., accepting that, under the binding agreement ultimately extended to him by the government, he would be sentenced to 35 to 50 years in prison.  (Dkt. No. 305.)  Any sentence Mr. Rios receives in this range effectively ends the life he knew.

Mr. Rios's actions that night forever altered many lives, a fact of which he is acutely aware.  He recognizes the profound loss experienced by F.A.'s mother, who will no longer see her son, and F.A.'s girlfriend, whose future life with him was irrevocably shattered.  In a concurrently lodged sentencing video, Mr. Rios expresses his deep remorse for the pain and lost dreams his actions caused.  (Exhibit 1.)  He wishes he could turn back time and prevent the events of that night, understanding now the permanent impact of his decisions.

Mr. Rios did not set out that night intending to cause a killing.  Evidence shows that F.A.'s tragic death was the result of a robbery gone wrong, not a premeditated act to kill.  When F.A. reacted to the robbery by retrieving his weapon and shooting first at Mr. Rios and his codefendant, the situation escalated.  In discussing the sequence of events that night, Mr. Rios emphasizes that he is not implying F.A. did anything wrong or bears any responsibility for Mr. Rios's and his codefendant's actions.  The circumstances of the gunfire exchange, however, are a crucial consideration for understanding the context of the night and the ultimate punishment Mr. Rios should receive.  They distinguish Mr. Rios from defendants who have received sentences

1

shorter than 35 years despite acting deliberately with the intent to kill, a more culpable mental state that Mr. Rios never possessed.

Importantly, unlike many racketeering defendants, Mr. Rios never held any leadership or decision-making responsibilities in the gang. His historically low-level role is reflected in his relatively minor criminal history, which indicates that he never played a significant role in the gang's operation or criminal activities. As he transitioned into adulthood, Mr. Rios began distancing himself from the gang. He took significant steps like securing stable employment and moving away from the neighborhood that was under the gang's influence. However, his ongoing struggle with drug addiction impeded his efforts to completely sever his ties from the gang. The familiar environment of his old associations not only provided easy access to drugs but also provided a sense of camaraderie with fellow users, creating a misguided sense of belonging and support. These factors made him particularly susceptible to old habits and influences during his brief visits back to Los Angeles.

As will be argued more fully below, Mr. Rios should be sentenced to 35 years' imprisonment. This significant sentence is commensurate with the gravity of the offense; indeed, it even exceeds the national and local sentencing trends for similarly situated defendants who commit similar crimes by about 10 years. Additionally, by the end of this proposed sentence, Mr. Rios's risk of reoffending is expected to be very low, almost negligible. A sentence of 35 years strikes a careful balance: it is sufficiently lengthy to reflect the seriousness of the crime, considers the specific context of Mr. Rios's actions, and aligns with the goals of specific and general deterrence. Importantly, it is the only sentence that can be imposed to avoid unwarranted sentencing disparities. A 35-year term is thus "sufficient, but not greater than necessary" to satisfy the objectives of 18 U.S.C. § 3553(a).

## II.    ARGUMENT

In determining the appropriate sentence for Mr. Rios, the Court must consider all of the statutory sentencing factors set forth at 18 U.S.C. § 3553, including the nature and circumstances of the offense; the history and characteristics of the offender; the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence; the need to provide the defendant with needed education, vocational training, medical care or other correctional treatment; the applicable sentencing range under the advisory sentencing guidelines; and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a); *United States v. Booker,* 543 U.S. 220 (2005).  The task for the Court is to impose a reasonable sentence, based on the individual defendant and the facts and circumstances of the particular case, that is "sufficient, but not greater than necessary," to achieve the statutory purposes of sentencing.  18 U.S.C. § 3553(a).

## A.    The Advisory Guidelines

Section 3553(a) "explicitly directs sentencing courts to consider the Guidelines . . . and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  Although the guidelines are not mandatory, they "will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quotation marks omitted).  Further, the Guidelines "help secure nationwide consistency" and thus serve as an important benchmark throughout the sentencing process. *Gall*, 552 U.S. at 50.  If, after considering the remaining § 3553(a) factors, a district court "decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*  "[A] major departure should be supported by a more significant justification than a minor one." *Id.*  "To sustain an upward variance, the district court . . . must state with specific reason why the defendant's conduct was more harmful or

3

egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 309–09 (D.C. Cir. 2018) (cleaned up); *see also United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020) ("[A] sentence that departs from the advisory range in a mine-run case warrants closer review of the district court's justifications for variance.") (quotation marks omitted).

At a total offense level of 40 and as a category II offender, Mr. Rios's advisory range is 324 to 405 months, or 27 to 33.75 years.  (PSR ¶ 82.)  As discussed below, that range tracks the national, Ninth Circuit, and California sentencing trends for murder. Because Mr. Rios caused a killing during the course of a robbery (*i.e.*, "felony murder"), he is guilty of first-degree murder under California law.  Cal. Penal Code § 189(a).  Nonetheless, the guidelines recognize that such killings may involve a less culpable mental state than those that occur after premeditation or lying in wait.  *See* U.S.S.G. § 2A1.1, cmt. 2(B) (providing that a downward departure may be warranted for felony murder offenses when the guidelines call for life imprisonment).

If this Court accepts the binding plea agreement, the minimum sentence it can impose on Mr. Rios is 35 years.  This sentence exceeds even the high end of the guidelines range by over one year, and it exceeds the low end by eight years.  In contrast, a 50-year sentence would not only be 16.25 years above the highest reasonable standard set by the Sentencing Commission, it would also, as discussed below, be double the national and local averages for similar offenses.  Any sentence above 35 years thus represents a major deviation from the guidelines and requires a substantial justification, which does not exist here.  Instead, a sentence of this magnitude would result in a severe and unwarranted sentencing disparity.

4

**B.    Mr. Rios's History and Characteristics[1]**

Mr. Rios's upbringing reflects the challenging realities faced by many young people in the impoverished Florence-Firestone neighborhood of Los Angeles. His early years were characterized by familial separation, educational struggles, and exposure to a brutal environment dominated by gang culture and violence. Between four and 16 years old, Mr. Rios moved 15 times, to and from various neighborhoods of Los Angeles, Mexico, and Texas, never living in a home for more than one year at any given time. He directly witnessed extreme acts of cruelty as young as 12, such as severed heads, shootings, and other grisly scenes, which greatly impacted him. These experiences played a huge role in shaping his decisions, actions, and eventual involvement with Florencia 13 ("F13").

**1.    Minimal Parental Guidance, Poor Education, Substance Abuse, Exposure to Violence, and Three Suicide Attempts**

Like many in his neighborhood, Mr. Rios joined F13 as a teenager because of the lack of a stable family and parental guidance. Mr. Rios's parents had a turbulent relationship. Mr. Rios's mother left his father while she was pregnant with Mr. Rios. The couple reconciled only to split again, after Mr. Rios's father assaulted his mother. His father left for Houston, Texas, and Mr. Rios stayed with his mother in Los Angeles. His mother worked long hours to provide for Mr. Rios and his three siblings, resulting in Mr. Rios spending most of his childhood without any significant parental presence.

Mr. Rios struggled academically. In fifth grade, Mr. Rios was placed in special education classes. Prior to that, he had repeated a grade and been placed in English as a Second Language classes. Feeling overwhelmed, Mr. Rios lost interest in school and began getting into trouble. As a response, his overburdened mother sent him to live

---

[1] The following information was collected through defense interviews of Mr. Rios, his employer, his various family members, records review, and statements Mr. Rios made during a clinical interview. (*See* Exhibit 2, concurrently filed *under seal* because it is a psychological evaluation.)

with his father in Houston.  When he arrived in Houston, he started the sixth grade but did not fare much better.  His father was also busy working long hours and Mr. Rios again lacked consistent parental guidance at home.

Because of his challenges in school and at home, Mr. Rios's father sent him to live with his relatives in a small town outside Acapulco in the state of Guerrero, Mexico.  During this time, around 2006, a shift took place in Acapulco when violence broke out between competing cartels involved in drug trafficking, which prompted government crackdowns and military intervention.[2]  As media outlets recognized at the time, "Acapulco became a narco war zone," and fights often broke out publicly in the street.[3]  Beheadings and execution-style killings were common.[4]

Mr. Rios himself witnessed some of this gruesome violence as a young teen.  He saw mangled bodies hanging from bridges and severed heads on the streets with cartel warning signs.  Mr. Rios witnessed the fatal shooting of his uncle and recalls seeing brain matter coming out of his head.  His godfather, who sold mangoes, was also killed for not paying "taxes" to the cartel to sell fruit.  Another uncle of Mr. Rios was kidnapped for ransom.  When Mr. Rios's father could not pay the full ransom, the assailants threatened to kidnap another family member to increase the pressure. Mr. Rios's father feared they would kidnap his son, so he brought Mr. Rios back to Houston.

---

[2] Joshua Partlow, "Acapulco is Now Mexico's Murder Capital," The Washington Post (Aug. 24, 2017), https://www.washingtonpost.com/graphics/2017/world/how-acapulco-became-mexicos-murder-capital/ (discussing local accounts that date the beginning of cartel violence in Acapulco to January 2006).

[3] Nathaniel Janowitz, "Ten years into Mexico's drug war, the violence in Acapulco rages on," Vice News (Nov. 9, 2016), https://www.vice.com/en/article/59wm5q/ten-years-into-mexicos-drug-war-the-violence-in-acapulco-rages-on.

[4] Indira A.R. Lakshmanan, "Drug trade threatens Mexican resort area," N.Y. Times (Jul. 30, 2006), https://www.nytimes.com/2006/07/30/world/americas/30iht-mexico.2332250.html. ; Associated Press, "3 bodies found headless near Acapulco," NBC News (May 8, 2010), https://www.nbcnews.com/id/wbna37044561.

In addition to witnessing cartel violence, Mr. Rios has a vivid traumatic memory involving the death of his toddler cousin in a drunk driving accident, which he witnessed.  Mr. Rios, in a state of shock, rushed toward the scene and had to extricate his cousin from underneath the car.  He was confronted with the harrowing sight of his cousin's face severely burned and his left eye dislodged.  Frantically, Mr. Rios carried his injured cousin to his aunt's house, screaming and crying for help along the way. His cousin succumbed to his injures before the ambulance arrived.

Upon his return to the United States, Mr. Rios grappled with the trauma he experienced.  He recalls having nightmares and crying himself to sleep because of the fear he felt and the violence he witnessed abroad.  Mr. Rios started the seventh grade in Houston but struggled.  His father allowed him to drop out of school and start working odd jobs instead.  He never returned to school.  The 13-year-old Mr. Rios began drinking alcohol and using drugs regularly, including Xanax, crystal methamphetamine, cocaine, and alcohol.

Dr. Miguel Gallardo, in his psychological evaluation, highlighted that Mr. Rios's psychological symptoms predated his substance abuse.  (Exhibit 2, at 3–4.) Dr. Gallardo examined the traumatic events from Mr. Rios's childhood and determined that his early and habitual drug use was a coping strategy that allowed Mr. Rios to deal with and temporarily escape from his deep-seated feelings of anxiety, depression, and trauma.  (*Id.* at 3.)  Although the drug use offered Mr. Rios temporary solace, it did not alleviate his underlying feelings of anxiety and isolation.  These unaddressed mental health issues culminated in a suicide attempt at 13 years old, when Mr. Rios tried to overdose on Xanax pills.

When he was approximately 15, Mr. Rios returned to Los Angeles.  His mother had started a new relationship, and Mr. Rios felt unwanted at her home.  He jumped from place to place, including staying at friends' places.  Mr. Rios's brother and two cousins had become involved with F13 by this time.  Eventually, Mr. Rios joined the

7

gang and immersed himself in an environment where he and his friends used
methamphetamine, drank alcohol, and smoked marijuana daily. Mr. Rios turned to
drugs to address feelings of anxiety. Although the gang gave him friends, he felt a
sense of loneliness that would not dissipate. When he was 16, he became suicidal for a
second time. He obtained a gun with which to kill himself, but ultimately did not.

At 16 years old, Mr. Rios met Yadira Robles and began a long-term relationship.
Eventually, the couple would have three daughters. Shortly after the birth of his first
daughter, in approximately 2017, Mr. Rios relocated his family away from the F13
neighborhood to Houston, where he found steady work and resolved to try to
financially support his family and raise his children. Unfortunately, Mr. Rios again
succumbed to alcohol and drug addiction (primarily cocaine). Ms. Robles did not
approve of Mr. Rios's drug habits and told him that she didn't want their daughters
growing up with a drug-addicted father. Mr. Rios, ashamed that his addictions were
interfering with his relationship with his children, attempted suicide for the third time
by trying to hang himself.

## 2. Joining F13

Growing up in a gang-infested neighborhood, Mr. Rios frequently encountered
members of F13. He, like many other young individuals in the neighborhood, was
already at a high risk of joining the gang. In fact, the Department of Justice estimates
that 17 percent of children will at some point join a gang in a gang-saturated
neighborhood. *See* James C. Howell, "Gang Prevention: An Overview of Research and
Programs," U.S. Dep't of Justice, Office of Justice Programs, Office of Juvenile Justice
& Delinquency Prevention, at 2 (Dec. 2010),
https://www.ojp.gov/pdffiles1/ojjdp/231116.pdf.[5]

---

[5] A comparison of population data to estimates of F13's total membership shows
that almost one in 20 people in Florence-Firestone is a member of F13. *See* "U.S.
Census Bureau Quickfacts," U.S. Census Bureau (Aug. 212, 2021),

Florence-Firestone is also surrounded by numerous gangs, including rivals. Consider the below graphic; each shaded area represents a different gang "territory" surrounding the Florence-Firestone neighborhood:



---

https://www.census.gov/quickfacts/fact/table/florencegrahamcdpcalifornia,lafayettecity california,comptoncitycalifornia/PST045219 (placing the population of the neighborhood at 70,000); Sam Quinones, "The Queen of Florencia," *L.A. Magazine* (Sept. 25, 2017), https://lamag.com/crimeinla/arlene-rodriguez-queen-of-florencia (estimating 2,000 active F13 members); Att'y Gen.'s Report to Congress on the Growth of Violent Street Gangs in Suburban Areas (Unclassified), Appendix B, Nat'l-Level Street, Prison, & Outlaw Motorcycle Gang Profiles, https://www.justice.gov/archive/ndic/pubs27/27612/appendb.htm (estimating 3,000 active F13 members).

"Gangs of Los Angeles (2022)," Google Maps.[6]  For example, the area surrounding Florence-Firestone is home to gangs such as the 76 East Coast Neighborhood Crips, Mad Swan Bloods, Trabiesoz, Morton Town Stoners, South Gate Locos, 73 Hustler Crips, Southside Playboys, 92 Bishop Bloods, Grape Street Watts, Blood Stone Villains, and 48 Gangster Crips—and the list continues.  This intense gang presence naturally increased the pressures to join a gang for a teenager who felt displaced from home.

Mr. Rios was only 15 when he joined F13, a decision influenced by his dire circumstances: he was homeless, and his cousin, who was close in age and someone he greatly admired, had also just joined the gang.  His initiation involved a brutal ritual in which he was "jumped in," suffering a beating by three members, two of whom were much older.  This violent induction, however, was followed by a contrasting sense of belonging and support.  F13 members, aware of his situation on the streets, began to look out for him.  An older member in particular took Mr. Rios under his wing, introducing him to a lifestyle that seemed desirable amidst his hardships—suddenly, teenage Mr. Rios was surrounded by nice cars, house parties, and a sense of community.  F13 members also provided him with basic necessities like clothing and shoes, and he was welcomed into their homes.

According to the DOJ, key reasons for joining a gang include seeking protection and a sense of community, especially in areas where safety is a daily concern.  Howell, *supra*, at 1, 4–9.  Additionally, factors like substance abuse, mental health issues, experiencing traumatic events, family gang involvement, and unstable family dynamics further heighten the risk of gang affiliation.  *Id.* at 6.  Each of these factors played a critical role in Mr. Rios's life.  Traumatic experiences, like witnessing beheaded bodies

---

[6] Available at https://www.google.com/maps/d/viewer?mid=1ul5yqMj7_JgM5xpfOn5gtlO-bTk&hl=en_US&ll=33.96459074722528%2C-118.21942900248192&z=13.  Each highlighted zone is determined to be dominated by its own gang.

dangling in the streets, or seeing his uncle being fatally shot when he was only 12 years old, allowed him to see firsthand the consequences of being unprotected in a dangerous environment and drove him to seek security and belonging. Substance abuse and mental health struggles skewed his decision-making, and the gang became a place where he could have reliable and consistent access to drugs. With his brother and two cousins already in F13, a path within the gang seemed inevitable. The absence of robust family support and guidance left him especially susceptible to the influences of gang culture. And finally, the context of his neighborhood played a pivotal role in his decision to join F13. The dominating presence of F13, combined with the dense network of rival gangs encircling it, created a challenging and perilous environment for him. Joining F13 thus became a necessity for survival and belonging.

Mr. Rios never assumed a role as a leader, organizer, or major participant in F13's criminal endeavors, and his criminal history was relatively minor compared to that of a typical gang member. He committed two offenses as a juvenile and served two short stints in jail as an adult, also for minor offenses. Specifically, at 16, Mr. Rios was arrested for theft and later for possessing a small quantity of marijuana. (PSR ¶ 50–51.) Then, at 20, he served a 10-day sentence for marijuana possession and criminal trespass, followed by a 14-day sentence the next year for contempt / disobeying a court injunction, all misdemeanors. (PSR ¶ 52–53.) Notably, unlike many who climb the ranks within a gang, Mr. Rios has never faced charges for more serious offenses often associated with gang activity, such as drug trafficking, firearms offenses, or violent crimes.[7]

---

[7] *See, e.g.,* Amanda B. Gilman, et al., "Long-Term Consequences of Adolescent Gang Membership for Adult Functioning," Am. J. Pub. Health (May 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3987584/; J.C. Barnes, et al., "Estimating the Effect of Gang Membership on Nonviolent and Violent Delinquency: A Counterfactual Analysis," Aggressive Behavior (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3151646/.

This lack of criminal history also meant that Mr. Rios never was offered substance abuse or mental health treatment, or other gang intervention services. This absence of intervention and support services lessened his chances of fully disengaging from the gang or addressing the underlying issues contributing to his involvement.

### 3.    Efforts to Leave F13: Relocation, Employment, Substance Abuse

In his twenties, Mr. Rios endeavored to distance himself from gang life. The birth of his first daughter in 2018 and steady employment marked the beginning of these efforts. He secured employment with RSL Construction in Houston and even told his friends in the gang that he was ready to move on and leave that life behind. Over the next few years, he divided his time between Los Angeles and Houston. In California, he initially worked in construction with Ms. Robles's father, later transitioning to a better paying role transporting drywall. He also worked with temp agencies like People Ready in South Gate. In Houston, his work primarily involved drywall projects for clients like AutoZone, O'Reilly's, Family Dollar, and Advanced Auto Parts.

In 2021, while on a drywall job at a motel in Oklahoma, Mr. Rios met Haylee Grisham. They kept in touch after he left Oklahoma, but once Ms. Robles discovered the relationship, she moved back to California with their daughters. This upheaval plunged Mr. Rios into a period of severe cocaine abuse, and he began using Seroquel to cope with the stress and to sleep. His cocaine use escalated to as much as half an ounce a day, with the longest break being only two weeks. Ms. Grisham eventually moved to Houston to join Mr. Rios, and together they traveled extensively for work, undertaking drywall projects for various AutoZone stores across states like Kansas, Arkansas, Connecticut, Wisconsin, and Texas. In December 2021, shortly before the night underlying this offense, they planned a trip to Los Angeles so Mr. Rios could attend his daughter's birthday and spend the holidays with his family.

12

Mr. Rios recognized that family responsibilities, stable employment, and relocating to Texas were steps toward leaving gang life.  But, as government agencies have noted, exiting a gang is a "complicated" and "long-term process," especially when one grew up in an "entrenched gang area."  Michelle Arciaga Young & Victor Gonzalez, "National Gang Center Bulletin," U.S. Dep't of Justice, Office of Juvenile and Delinquency Prevention (Jan. 2013), at 1, 5.[8]  Gang members often feel overwhelmed "by the number of steps they must take" to successfully leave the gang. *Id.* at 5–6.  Complete disengagement involves overcoming various barriers, like lack of education, unresolved mental health and substance abuse issues, reliance on the gang for social support, and breaking multigenerational gang ties. *Id.* at 3.  This process also entails a profound shift in personal identity, redefining concepts of masculinity, self-protection, and respect. *Id.* at 4.  Government agencies recommend a gradual disconnection, or "fading away," from the gang to avoid the violent repercussions that are often associated with renouncing membership. *Id.* at 3.

Mr. Rios never received gang reentry or rehabilitation services.  Despite genuine efforts to leave gang life through relocation and stable employment, he struggled with untreated substance abuse and mental health issues and still met up with his friends from the gang when visiting Los Angeles, often because he knew they would have drugs and that he could use with them.  In fact, according to discovery provided by the government, in the days leading up to Mr. Rios's return to Los Angeles, he repeatedly expressed to a friend his strong desires to binge on cocaine upon arrival.  On the day of the robbery involving F.A., Mr. Rios, having run out of money, expressed the need to "rob" people to afford more drugs.

Mr. Rios does not seek to minimize his involvement with F13.  To be sure, he was a member for several years, though he never achieved any meaningful position or

---

[8] Available at https://www.nationalgangcenter.gov/Content/Documents/Getting-Out-Staying-Out.pdf.

13

influence within it.  And even since being in custody, he has not attempted to maintain or elevate his status in F13, a notable decision considering the presence of numerous Mexican Mafia and F13 members and leaders in the jail.  Instead, he has focused on personal growth and reflection, including participating in Bible study groups at the Santa Ana Jail.  This commitment to self-improvement and spiritual exploration while incarcerated, along with his full and consistent acceptance of responsibility, highlights his dedication to turning a new page in his life, moving away from his past affiliations. Mr. Rios's family and friends support him and his efforts at rehabilitation, as is evidenced by their participation and statements in the defense sentencing video (Exhibit 1), which provides the Court an opportunity to hear from them and Mr. Rios directly about Mr. Rios's life leading up to the offense, and by their letters of support (Exhibit 3, collecting letters).

### 4.    Post-Arrest Psychological Evaluation

In May 2023, Mr. Rios underwent a psychological evaluation conducted by Dr. Gallardo.  During their interviews, Mr. Rios reported the previously mentioned incidents.  (*See* Exhibit 2, at 5–14.)[9]  Dr. Gallardo's findings indicate that Mr. Rios experienced a "consistent pattern" of trauma, isolation, and the development of unhealthy coping mechanisms that significantly impacted his life outcomes.  (*Id.* at 2.) Dr. Gallardo observed that from an early age, Mr. Rios had to navigate life largely on his own, perceiving the world as unsafe, and rarely trusting or relying on others.  (*Id.* at 3.)  He noted that Mr. Rios lacked access to psychological care to address his symptoms of anxiety and depression.  (*Id.* at 4.)

Further, Dr. Gallardo highlighted the prominence of Mr. Rios's drug dependence, to the extent that he saw suicide, which he attempted three times, as his "best solution."  (*Id.*)  Last, Dr. Gallardo concluded that "[Mr. Rios's] drug use appears

---

[9] Dr. Gallardo, in his evaluation, determined that  Mr. Rios was "an accurate historian in his recollection of his life events," noting that he was able to "follow[] a clear timeline that was consistent" throughout his recounting.  (Exhibit 2, at 5.)

to have helped [him] cope and deal with the early onset of psychological symptoms, increase his ability to better negotiate interpersonal relationships, and gain access to a support system outside his home, where he often felt alone and disconnected." (*Id.* at 4–5.)  Dr. Gallardo diagnosed Mr. Rios with several mental health conditions, including anxiety disorder, posttraumatic stress disorder, persistent depressive disorder, alcohol and stimulant use disorders, and a history of suicidal behavior.  (*Id.* at 2.)

In light of these diagnoses, Dr. Gallardo emphasized the necessity of a multifaceted treatment approach for Mr. Rios.  He recommended that Mr. Rios receive alcohol and drug treatment, undergo psychological counseling, and consult a psychiatrist to begin a medication regimen tailored to his psychological symptoms.  (*Id.* at 28–29.)  Dr. Gallardo also opined that a combination of these treatments, along with Mr. Rios's participation in cognitive behavioral therapy, can significantly reduce his risk of reoffending.  (*Id.* at 29.)  Mr. Rios is eager to take advantage of all resources available to him through the Bureau of Prisons, including the Residential Drug Abuse Program.

## C.    The Nature and Circumstances of the Offense

Mr. Rios's involvement in two armed robberies, one of which tragically resulted in a fatality, is undeniably serious.  A 35-year prison sentence adequately reflects the severity of these actions.  In the first incident, Mr. Rios and a codefendant robbed two individuals outside a bar in the Florence-Firestone neighborhood.  (Dkt. No. 296, at 11.)  After obtaining cash from the victims, Mr. Rios and his codefendant left without causing physical injury.

The next night, Mr. Rios and his codefendants decided to rob F.A. and his girlfriend, A.M.  It is undisputed that neither Mr. Rios nor his codefendants knew that F.A. was an off-duty police officer.  According to A.M.'s account, after F.A. handed over his belongings, he drew his service weapon and began shooting at Mr. Rios and his codefendant.  F.A., who did not identify himself as a police officer and was not in

15

uniform, was hit in the ensuing gunfire.  Mr. Rios and his codefendants quickly fled the scene and left A.M. physically unharmed.  Tragically, F.A. succumbed to his injuries soon after.

Mr. Rios committed these robberies following a period of intense cocaine use and a desperate need for money.  His primary motivation was financial gain.  During the robberies, Mr. Rios did not exhibit behavior typical of gang glorification, such as announcing gang affiliation, wearing gang-related attire, or explicitly acting in the gang's name.[10]  There is also no evidence that Mr. Rios or his codefendants acted at the direction of F13 leadership.  The nature of these crimes, committed by a lower-level member like Mr. Rios, contrasts starkly with those ordered by gang leadership, which typically involve more premeditation and are directly linked to the gang's broader objectives.  Mr. Rios's actions, motivated by personal circumstances rather than to maintain or advance his position within the gang, indicate a reduced level of culpability relative to other gang-directed offenses.

After his arrest, Mr. Rios was placed in a cell with two undercover agents posing as high-ranking members of F13 and the Mexican Mafia.  Mr. Rios admitted to his involvement but notably did not glorify his actions or revel in the fact that the victim was a police officer.  When questioned, Mr. Rios explicitly denied that his actions were gang related.  Additionally, he exhibited no interest in continuing gang-related activities or contributing to gang operations while incarcerated.  And, over the last two years in custody, Mr. Rios has done nothing to advance or promote the gang's interests.

A 35-year sentence adequately addresses the nature and circumstances of these crimes.  It addresses the inherent danger of Mr. Rios's actions and the unfortunate series of events that led to F.A.'s death, but also the indisputable fact that the tragic outcome was not his intended goal.  Thus, a 35-year sentence captures the seriousness

---

[10] None of the victims reported hearing Mr. Rios or his codefendants posing questions typical of a targeted gang attack, such as "Where are you from?", or promoting F13 during the crimes.

of the offenses while considering the broader context of Mr. Rios's circumstances and
actions.

**D.     The Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) directs courts "to avoid unwarranted sentence disparities
among defendants with similar records who have been found guilty of similar conduct."
"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity
in sentencing rather than uniformity among co-defendants in the same case." *United
States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007) (quoting *United States v.
Parker*, 462 F.3d 273, 277 (3d Cir. 2006)); *see also United States v. Boscarino*, 437
F.3d 634, 638 (7th Cir. 2006) ("[T]he kind of 'disparity' with which § 3553(a)(6) is
concerned is an unjustified difference across judges (or districts) rather than among
defendants to a single case.").

This consideration becomes particularly crucial when contemplating a sentence
substantially above the advisory guidelines range. *See United States v. Kwon Woo
Sung*, 740 Fed. App'x 878, 880 (9th. Cir. 2018) (citing *United States v. Carty*, 520 F.3d
984, 992–93) (9th Cir. 2008) (en banc)) (explaining a court must give "acute" attention
to this factor when varying significantly above the range). The Ninth Circuit, sitting en
banc in *Carty*, stated that a judge must carefully justify the degree of deviation from the
Guidelines—particularly because it raises a potential for creating unwarranted
sentencing disparities:

> If a district judge decides that an outside-Guidelines sentence
> is warranted, he must consider the extent of the deviation and
> ensure that the justification is sufficiently compelling to
> support the degree of the variance. . . . [T]he greater the
> variance, the more persuasive the justification will likely [need
> to] be because other values reflected in § 3553(a)—such as, for

17

1    example, unwarranted disparity—may figure more heavily in

2    the balance.

3 *Carty*, 520 F.3d at 991–92 (quotation marks and citations omitted).  Importantly, when

4 assessing the need to avoid unwarranted sentencing disparities, a court must "compar[e]

5 the facts of this case to similar defendants," *not* simply "use[] the statutory penalties for

6 the conviction . . . as the reference point for the sentence it [will] impose . . . ."  *Perez-*

7 *Rodriguez*, 960 F.3d at 756–58 (holding district court erred in imposing upward

8 variance by improperly relying on statutory maximum rather than similarly situated

9 defendants and desire to "send a message" to other offenders).

10    **1.    National Sentencing Data**

11    Data from the United States Sentencing Commission shows that the typical

12 federal sentence for murder ranges between 20 to 25 years.  *See id.* at 756–57

13 ("[S]entencing data released by the Sentencing Commission should serve as a starting

14 point for district judges to avoid unwarranted sentencing disparities.") (quotation marks

15 omitted).  This trend holds true across the nation, the Ninth Circuit, and California:

| FY | National | | | Ninth Circuit | | | California | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Cases | Mean (Months) | Median (Months) | Total Cases | Mean (Months) | Median (Months) | Total Cases | Mean (Months) | Median (Months) |
| 2022 | 410 | 261 | 240 | 45 | 242 | 204 | 10 | 244 | 229 |
| 2021 | 257 | 244 | 231 | 14 | 243 | 220 | 8 | 222 | 220 |
| 2020 | 294 | 255 | 228 | 29 | 280 | 264 | 14 | 312 | 312 |
| 2019 | 373 | 255 | 240 | 43 | 237 | 168 | 18 | 169 | 136 |
| 2018 | 318 | 291 | 292 | 35 | 281 | 300 | 16 | 251 | 180 |
| 2017 | 72 | 224 | 180 | 23 | 218 | 240 | 4 | 215 | 164 |

23 U.S. Sent. Comm'n, Statistical Information Packets.[11]

---

25    [11] These numbers were taken directly from the Commission's Statistical
26 Information Packets issued for each fiscal year.  The national and Ninth Circuit data are
  available at:

27    • 2022 Federal Sentencing Statistics - Ninth Circuit (Apr. 2023), Table 7, at
  p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-

28                                          18

publications/federal-sentencing-statistics/state-district-circuit/2022/9c22.pdf;

- 2021 Federal Sentencing Statistics - Ninth Circuit (Apr. 2022), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/9c21.pdf;

- 2020 Federal Sentencing Statistics - Ninth Circuit (Apr. 2021), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/9c20.pdf;

- 2019 Federal Sentencing Statistics - Ninth Circuit (Apr. 2000), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/9c19.pdf;

- 2018 Federal Sentencing Statistics - Ninth Circuit (Apr. 2019), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/9c18.pdf;

- 2021 Federal Sentencing Statistics - Ninth Circuit (Apr. 2018), Table 7, at p. 10, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/9c17.pdf.

The California data is available at:

- 2022 Federal Sentencing Statistics - California (Apr. 2023), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/ca22.pdf;

- 2021 Federal Sentencing Statistics - California (Apr. 2022), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ca21.pdf;

- 2020 Federal Sentencing Statistics - California (Apr. 2021), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/ca20.pdf;

- 2019 Federal Sentencing Statistics - California (Apr. 2000), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/ca19.pdf;

- 2018 Federal Sentencing Statistics - California (Apr. 2019), Table 7, at p. 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/ca18.pdf;

- 2021 Federal Sentencing Statistics - California (Apr. 2018), Table 7, at p. 10, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/ca17.pdf.

The above data shows that out of hundreds of individuals sentenced annually for murder across the United States, the average sentence has consistently remained well below 35 years.  Nationally, as well as in the Ninth Circuit, the highest average sentence never exceeded 24 years, while in California, it reached 26 years (in 2020).  Meanwhile, the lowest average sentence nationally and in the Ninth Circuit has hovered just above 18 years; in California, it went even lower to around 14 years.  Thus, a 35-year sentence for Mr. Rios exceeds even the highest average sentence in California by nine years.  A 50-year sentence, in comparison, would be *double* even the highest national and local averages.

Further insights are available from the Sentencing Commission's interactive tool, which allows users to filter sentencing data by the criminal history category of offenders.[12]  (Declaration of Counsel ¶ 2–3.)  That data also aligns with the previously mentioned trends.  Since 2015, about 241 category II offenders nationwide have been sentenced for murder.  (*Id.*)  The average sentence for these offenders was 284 months, or 23.67 years, with a median of 288 months, or 24 years.  (*Id.*)  In other words, the 35-year sentence Mr. Rios seeks is significantly above these averages by over a decade.

Moreover, even when considering category VI "Career Offenders"—the most serious recidivists with multiple prior crimes of violence and/or drug trafficking offenses, *see* U.S.S.G. § 4B1.1(a)—the sentences are substantially shorter than what Mr. Rios is seeking.  (Counsel Decl. ¶ 4–5.)  For this category, about 108 offenders were sentenced, with the average sentence being 309 months, or 25.75 years, and the median being 360 months, or 30 years.  (*Id.*)  Thus, the sentence Mr. Rios proposes exceeds the average sentence for these high-category offenders by almost a decade.

Last, the Sentencing Commission also allows users to access individual offender datafiles, which can be parsed using software called IBM SPSS.  (*Id.* ¶ 6.)  For the fiscal years 2013 to 2022, there were 114 cases where § 2A1.1 was the primary

---

[12] Available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.

guideline chapter, the final offense level was 40 (including a reduction for acceptance of responsibility), and the offender fell in criminal history category II. (*Id.*) Among those cases, the average sentence was 224.18 months (18.7 years), with a median of 207 months (17.25 years). (*Id.* ¶¶ 6–7.)[13] Notably, in only *three* of those cases did a judge sentence the individual above the guidelines range. (*Id.*) This case would be the fourth.

### 2.    Specific Sentences for Murder in the Racketeering Context

Examining specific murder cases in the racketeering context further illustrates that a 35-year sentence is an appropriate sentence here. In this district, for example, a 20-year sentence was imposed on a Wilmas gang member who shot an individual multiple times, killing him, and, later that year, targeted another individual and attempted to murder him in a drive-by shooting. *United States v. Delgado*, 15-cr-688-DSF-11 (C.D. Cal. Jul. 21, 2022) (Dkt. No. 1233, at 8–10). Similarly, in *United States v. Peter Ojeda*, 8:11-cr-00148-JVS (C.D. Cal.), a 15-year sentence was given to a Mexican Mafia leader who ordered murders while serving a 14-year prison sentence for a prior RICO case. Dkt. No. 1456, at 6 (Gov't Sent. Pos.).

In the Northern District of California, a member of the Los Vagos gang, affiliated with the Mexican Mafia, was sentenced to 30 years for a gang-related murder. *United States v. Roberto Cervantes Serrano*, 5:16-CR-00482-BLF (N.D. Ca. 2016). As detailed in the government's sentencing memorandum, the defendant was partying with the victim in a motel room, but fatally shot her four times in the back of her head and neck after she made comments he perceived as disrespectful toward the gang. Dkt. No. 57, at 5. Additionally, in *United States v. Etienne*, 3:17-cr-00093-WHA (N.D. Cal. 2017), defendants Marcus Etienne and Mario Robinson received sentences of 34 years

---

[13] The data used for these analyses were extracted from the U.S. Sentencing Commission's "Individual Offender Datafiles" spanning fiscal years 2013 to 2022. These files are publicly available on its website. *See* U.S. Sent'g Comm'n, Commission Datafiles, https://www.ussc.gov/research/datafiles/commission-datafiles. (Counsel Decl. ¶ 6.)

and 32 years, respectively, for more egregious conduct than that of Mr. Rios. Etienne, the leader of an interstate drug trafficking operation, orchestrated two murders. First, he directed others to kill an individual he believed was stealing from his enterprise. Dkt. No. 556, at 1–2. Then, he misled the victim's family about his involvement by blaming another person, and, in an effort to lend credibility to that false accusation, he directed others to kill that other person as "retaliation" for the first victim's death. *Id.* In addition, Etienne personally engaged in violence by shooting at people he believed were threats to his enterprise. *Id.* Robinson helped facilitate one of these murders by luring the victim to a location and hiring another to carry it out. Dkt. No. 557, at 1–2. Despite the severity of these crimes, their sentences remained below the 35-year term that Mr. Rios seeks.[14]

This sentencing pattern for RICO murders extends nationwide and further supports a 35-year sentence for Mr. Rios. In *United States v. Agosto, et al.,* 1:17-cr-00390-RJD-3, 6, & 13 (E.D.N.Y 2017), three defendants involved in severe gang-related violence received sentences below 35 years. Maurice Brown, who participated in a double homicide and an execution-style-torture killing, was sentenced to 30 years. Dkt. No. 638. His accomplices, Luis Lopez and Peter Vasquez, who tortured one of the victims and helped dispose the bodies, received 18 and 22 years, respectively. Dkt. Nos. 590, 736.

Similarly, in the Southern District of Ohio, two "T&A Crips" members, Charles Carson and Michael Watson, received 30-year sentences. *See United States v. Bryant,*

---

[14] In the Northern District of California, three other defendants who participated in a murder conspiracy reached binding plea agreements with the government that contemplate sentences far shorter than Mr. Rios. One defendant murdered two individuals, including a 15-year-old, and the government agreed to a binding plea of 30 to 33 years. *See* Dkt. 110, *United States v. Madrigal*, CR 20-328 (N.D. Cal. Feb. 16, 2023). Another defendant committed one gang murder and an attempted murder, and reached a binding plea of 21 to 26 years, *id.* at Dkt. No. 110, while the third codefendant who aided and abetted these acts received a binding plea of 19 to 24 years, *Id.* at Dkt. No. 112. The sentencing hearing is scheduled for December 7, 2023. If the district court sentences these defendants prior to Mr. Rios's hearing, they are incorporated here as additional examples of similarly situated defendants.

2:18-cr-00204-MHW-2, 19 (S.D. Ohio 2018). Carson was involved in deliberate murder, attempted murders, and he robbed a convenience store, Dkt. No. 524, at 3–4, while Watson, a category VI offender, committed murder, attempted murders, and engaged in drug and firearms trafficking, Dkt. No. 548.

In the District of Maryland, a member of MS-13 received a 30-year sentence for a brutal murder involving stabbing a teenager 144 times with his fellow MS-13 members. *United States v. Rodriguez-Flores*, 8:20-cr-00229-PX-1 (D. Md. 2020), Dkt. No. 61, at 1–2. Elsewhere in Maryland, three other MS-13 members also received 30-year sentences for a RICO murder after luring the victim across state lines and stabbing him to death in a wooded area. *See United States v. Flores-Ventura*, No. 8:18-cr-00070-JKB-1, 2, 3 (D. Md. 2019) (Dkt. Nos. 126, 113, 119 (defendants' plea agreements)).

In the Southern District of Texas, five members of the Tri-City Bombers received 30-year sentences for participating in racketeering murders and/or attempted murder. *United States v. Lopez*, No. 4:15-CR-00564-2, 7, 26, 28, 31 (S.D. Tex. 2015). Their involvement ranged from direct killings to aiding and abetting murders. *See id.* at Margil Reyna, Jr.'s Plea Agreement, Dkt. No. 1582, at 10–13 (defendant shot and killed one victim, and then aided and abetted a separate murder of a victim's home believing it was a marijuana stash house); Jose Rolando Gonzalez's Plea Agreement, Dkt. No. 1685, at 10–14 (defendant aided and abetted the murder of a victim, and separately ordered the killing of another victim for an unpaid drug debt); Ramon De La Cerda's Plea Agreement, Dkt. No. 1688, at 11–12 (defendant chased and fatally shot a victim hiding behind a trash bin); Salomon Robles's Plea Agreement, Dkt. No. 1691, at 10–13 (defendant shot and attempted to kill one victim, and aided and abetted murder of a separate victim); Juan Alberto Mendez Plea Agreement, Dkt. No. 1694, at 10–14 (defendant ordered two murders, one of which was successfully carried out, while the victim survived the other attempted murder).

23

In Illinois, a Latin Kings member was sentenced to 30 years for driving into rival territory and brutally beating a rival to death with a metal crate. *See* Dkt. No. 2486, *United States v. William Hayslette*, 1:16-cr-00463 (N.D. Ill. Aug. 9, 2021). In North Carolina, a member of the Bloods gang was sentenced to 35 years for shooting a fleeing victim multiple times during an armed robbery, killing him. *See* Dkt. No. 2397, *United States v. Denzel Lamont Spikes*, 3:17-cr-00134-FDW-DSC (W.D.N.C. Feb. 1, 2019). In Missouri, a defendant who shot and murdered someone, along with participating in a drug trafficking scheme, was sentenced to 30 years. See Dkt. No. 364, *United States v. Luis Alfredo Villegas-Rosa*, No. 4:17-cr-00016 (W.D. Mo. Sept. 26, 2019). In Virginia, a gang leader from the Milla Bloods received a 27-year sentence after murdering one individual, and, in a separate incident, permanently injuring another after entering an apartment complex filled with bystanders and opening fire. *See* Dkt. Nos. 531, 600, *United States v. Dashawn Romeer Anthony*, No. 4:18-cr-00012-MFU (W.D. Va. Jan. 30 & Jun. 19, 2020).

It is indeed unusual for defendants who plead guilty to RICO murder to receive sentences exceeding 35 years, except in cases involving extraordinarily severe circumstances or multiple homicides. For example, one defendant in Virginia, who received a 36-year sentence, committed not one but two RICO homicides. *United States v. Kasey*, No. 7:18-cr-00048-EKD (W.D. Va. 2018). The case of Ralph Mendez in Indiana also serves as a pertinent example. *United States v. Ralph Mendez*, No. 2:17-cr-00138-PPS-JEM (N.D. Ind. 2017). Mendez's involvement in a RICO conspiracy led to eleven murders and at least 32 other victims being shot or wounded. He also directly murdered three individuals, including a child, and shot several others (permanently paralyzing one), *see* Dkt. No. 757, at 2–4, and thus received a substantial sentence of 510 months, or 42.5 years. Such a sentence reflects the exceptional gravity of his actions and culpability. In contrast, Mendez's codefendant, Justin Anaya, who

24

participated in two of those murders, received a sentence of 35 years—the same term that Mr. Rios is seeking.  Dkt. No. 1012, at 3–4.

Given this precedent, a sentence exceeding 35 years for Mr. Rios would be disproportionately harsh, even under the tragic circumstances here.  Unlike Mr. Rios, the above defendants personally ordered or committed deliberate, premeditated first-degree murders intended to advance gang interests.[15]  Despite the severity of their crimes, none of them received sentences exceeding the term Mr. Rios seeks.  Mr. Rios, on the other hand, committed felony murder, which is deemed less culpable than premeditated murder.  *See, e.g.*, U.S.S.G. § 2A1.1, cmt. 2(B).  Mr. Rios did not envision a killing or plan to commit murder but rather reacted to an unexpected armed response from F.A.  Additionally, Mr. Rios's decision not to harm F.A.'s girlfriend, the sole eyewitness, indicates that his decision to discharge the gun was driven by panic rather than a deliberate intent to kill.  That point is further bolstered by his nonviolent, relatively minor criminal record, which consists of trespass, contempt, and marijuana possession.  Thus, a 35-year term appropriately reflects the severity of Mr. Rios's crime while avoiding an unwarranted sentencing disparity.

### E.    Just Punishment, Deterrence, Public Safety, and Respect for the Law

A 35-year sentence will also provide just punishment, sufficient deterrence, public protection and promote respect for the law.  From the day of Mr. Rios's arrest in January 2022 until now, he has lived with the daily awareness of the tragic consequences of his actions, including the irreversible loss of life and the inability to offer closure to F.A.'s family and loved ones.  He has also faced the reality of spending the majority of his life in prison, missing the opportunity to be present in his three young daughters' lives.  Serving a 35-year sentencing will underscore the gravity of his actions to him.  Extending the sentence beyond this duration is not necessary to further

---

[15] There is no indication that any of the defendants in the cases discussed above cooperated or provided substantial assistance to the government.

stress upon him the seriousness of his actions.  Indeed, research has shown that, while
the certainty of being caught and punished has a deterrent effect, "increases in severity
of punishments do not yield significant (if any) marginal deterrent effects."  M. Tonry,
Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006).

Moreover, a term exceeding 35 years is not necessary for the purpose of general
deterrence.  *See United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (noting
that section 3553(a) "does not require the goal of general deterrence to be met through
a period of incarceration").  The sentencing trends across the country demonstrate that
courts have effectively addressed even the most severe gang-related murders with
sentences of 35 years or less.

Last, it is important to recognize that most individuals who join gangs do so at a
young age, often without a full understanding of legal consequences or sentencing
trends.  By the time they are entrenched in gang activities, facilitating disengagement
requires social services targeted at the underlying reasons they seek to stay with the
gang, such as addiction, mental illness, and economic displacement, rather than the
deterrent effect of severe sentencing.  Considering this context, a sentence exceeding 35
years would not significantly contribute to the broader goal of deterring gang
involvement or aiding the rehabilitation of current gang members.

/

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    CONCLUSION

In light of the reasons stated above, along with the words expressed by Mr. Rios and his family in the concurrently filed sentencing video, Mr. Rios respectfully requests that he be sentenced to 35 years' imprisonment.

Respectfully submitted,

CUAUHTÉMOC ORTEGA
Federal Public Defender

DATED: December 4, 2023        By  /s/ Waseem Salahi

WASEEM SALAHI
DAVID MENNINGER
Deputy Federal Public Defenders

27